JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5249 | **DATE** | 3/22/2001 |
| **CASE TITLE** | Technical Loss Services, Inc. vs. American Telephone and Telegraph | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to dismiss Plaintiff's amended complaint [8-1] is granted. Judgment is hereby entered in favor of the defendant and against the plaintiff. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | MAR 23 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 12 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TECHNICAL LOSS SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 00 C 5249 |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| AMERICAN TELEPHONE AND | ) | |
| TELEGRAPH COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
MAR 23 2001

## MEMORANDUM OPINION AND ORDER

Technical Loss Services, Inc. ("TLS") sues American Telephone and Telegraph Company ("AT&T") on behalf of itself and all other persons with AT&T telephone service within the Chicago area, alleging breach of contract and consumer fraud. Specifically, TLS claims that AT&T contracted to provide customers with local telephone service when it knew that it did not have the ability to process incoming and outgoing telephone calls. AT&T seeks dismissal of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). Because TLS's complaint essentially challenges the Illinois Commerce Commission's ("ICC") decision to allow AT&T to enter the local telephone market and the propriety of AT&T's ICC-approved rates, the ICC should first hear TLS's complaint. Accordingly, we grant AT&T's motion to dismiss.

## RELEVANT FACTS

TLS is an Illinois corporation that relies heavily on telephone service in its day-to-day operations. (R. 6, Am. Compl. ¶ 13.) On December 16, 1999, soon after AT&T entered Chicago's local telephone service market, TLS transferred its local and long-distance telephone service from Ameritech to AT&T. (Id. at ¶¶ 6, 14.) The AT&T sales representative who

executed the transfer told TLS that the transfer would be smooth. (Id. at ¶ 14.)

Shortly after TLS changed providers, it went without telephone service for one full week. (Id. at ¶ 15.) Further, TLS was not able to use either of its two modem lines or its one incoming fax line for an additional four days. (Id.) During that time, whenever TLS attempted to access an outgoing line, it received a message stating that "all circuits were busy" and to "please try again later." (Id.) People who were unable to phone or fax TLS's office began to call TLS's cellular phone and its corporate officers at home. (Id.)

TLS lodged several complaints with AT&T. (Id. at ¶ 16.) On February 3, 2000, one of TLS's corporate officers spoke with an AT&T representative, who said that AT&T had "terrible local service" and that "it was unfair to their clients." (Id. at ¶ 17.) On March 3, 2000, after a month of complaining to no avail, a TLS corporate officer spoke with an AT&T Operations Vice President and with representatives in AT&T's Executive Complaint and Legal Departments. (Id. at ¶ 20.) The TLS officer was informed that AT&T was unable to process incoming and outgoing calls because of a "capacity problem" in the Chicago area. (Id.)

TLS continued to complain to AT&T, but AT&T took no remedial action. (Id. at ¶ 21.) On March 22, 2000, TLS sent a letter of complaint to AT&T's Executive Complaint Department. (Id. at ¶ 23.) The letter requested a response, but TLS never received one. (Id.)

TLS received two invoices from AT&T: one for $750.96 and one for $1,312.89. (Id. at ¶ 25.) On April 16, 2000, TLS sent AT&T's Executive Complaint Department a letter explaining its problems, stating that it would not pay the bills and requesting a response. (Id. at ¶ 26.) Again, TLS never received a response. (Id.)

TLS lost business as a result of its telephone service problems. (Id. at ¶ 22.) Specifically,

TLS was unable to process incoming job prospects (Id. at ¶ 27.) Consequently, TLS endured the lowest billing period in the history of its business. (Id.) Moreover, the reduction in TLS's cash flow forced it to close its Atlanta branch and impelled one of its engineers at the Northbrook branch to quit. (Id. at ¶ 28.) Furthermore, TLS was unable to transfer its telephone service back to Ameritech because it did not have enough money to pay a $227.35 transfer charge. (Id. at ¶ 18.)

In its amended complaint, TLS alleges that AT&T was unable to process incoming and outgoing telephone calls because AT&T has a "capacity problem" in the Chicago area as a result of its "failure to contract for a sufficient number of 'pathways' between itself and Ameritech." (Id. at ¶ 8.) TLS further alleges that AT&T is aware of its deficiency but nevertheless continues to market and sell its telephone service to customers without disclosing its inability to process calls. (Id. at ¶ 12.) These allegations form the foundation of TLS's breach of contract and consumer fraud claims. AT&T moves to dismiss TLS's amended complaint, pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that it fails to state any claim upon which relief can be granted.

## LEGAL STANDARDS

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not the merits of the suit. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996). On a motion to dismiss, the Court must view all well-pleaded factual allegations in the complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to the plaintiff. *Dimming v. Wahl*, 983 F.2d 86, 87 (7th Cir. 1993). The Court will only grant a motion to dismiss if it is clear that the plaintiff can prove no set of facts warranting relief. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996).

**ANALYSIS**

Under the Illinois Public Utilities Act ("IPUA"), the ICC has the authority to allow a telecommunications carrier to provide local telephone service if it finds, after notice and a hearing, that the carrier "possesses sufficient technical, financial, and managerial resources and abilities to provide local exchange telecommunications service." 220 ILCS 5/13-405. Once the ICC approves a provider's entry into a local market, the provider must file a tariff setting forth the terms of its service and rates with the ICC. 220 ILCS 5/13-501. If a provider's tariffed rates are challenged, the ICC has the authority to hold hearings to determine if the rates are unjust or unreasonable. 220 ILCS 5/9-250. Finally, Illinois courts have consistently held that the ICC has primary and exclusive jurisdiction over complaints of excessive rates, and that the courts have jurisdiction over these matters only on administrative review. *Vil. of Evergreen Park v. Commonwealth Edison Co.*, 695 N.E.2d 1339, 1341 (Ill. App. Ct. 1998) (citations omitted).

TLS's complaint, though framed as an action for breach of contract and consumer fraud, is fundamentally linked to matters reserved for the expertise of the ICC, including: (1) whether AT&T should have been allowed to enter the local telephone service market in the first place; and (2) whether AT&T's rates are just and reasonable. First, TLS argues that the failure of AT&T to contract for a sufficient number of "pathways" between itself and Ameritech led to AT&T's "capacity problem."[1] (Am. Compl. at ¶ 8.) However, by authorizing AT&T to enter the local market, the ICC, in accordance with the requirements of the IPUA, already determined that

---

[1] TLS claims that it "merely challenges AT&T's practice of contracting to provide phone service to more customers than its ICC-approved infrastructure could support." (R. 10-1, Pl.'s Resp. to Def.'s Mot. to Dismiss at 9-10.) However, the certificates authorizing AT&T to enter the local telephone market do not contain any facial limitations on the number of customers with which AT&T may contract. (R. 11, Def.'s Reply Mem. in Supp. of its Mot. to Dismiss at 7.)

4

AT&T had sufficient pathways -- that is, possessed sufficient technical resources and abilities -- to provide local telephone service to Chicago area customers. *See* 220 ILCS 5/13-405. Should this Court vindicate TLS's claim, the relief granted would "necessarily force [AT&T] to do more than required by the [ICC]": namely, to provide more "pathways" between it and Ameritech. *See, e.g., Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000) (holding that the plaintiff's claim that AT&T Wireless contracted to provide cellular telephone services to customers without first building a sufficient infrastructure "tread directly on the very areas reserved to the Federal Communications Commission [("FCC")]," that is to say, "the modes and conditions under which AT&T Wireless may begin offering service in the Chicago market").[2] The IPUA, like the Federal Communications Act ("FCA"), specifically insulates these ICC decisions from our review.

Second, TLS's complaint about the quality of AT&T's service may be recast as a complaint that the service was not worth the rates charged. As the Seventh Circuit recently noted, "[in practice, most consumer complaints will involve the rates charged by telephone companies or their quality of service . . . . [A] complaint that service quality is poor is really an attack on the rates charged for the service . . . ." *Bastien*, 205 F.3d at 988 (citing *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998)). The Seventh Circuit ultimately determined that a preemption clause in the FCA barred the plaintiff in *Bastien* from attacking the FCC's market-entry and rate determinations in state court. *Id.* at 990. Similarly, the IPUA rule

---

[2] The FCC, not the ICC, was the regulatory body in *Bastien*. However, just as the IPUA makes the ICC responsible for assessing the adequacy of a local telephone service provider's technical resources, the FCA makes the FCC responsible for assessing the adequacy of a cellular service provider's infrastructure. *See Bastien*, 205 F.3d at 988. Therefore, the instant case and *Bastien* are analogous, and the principles set forth in *Bastien* apply here.

5

reserving rate challenges to the ICC precludes this Court from hearing the case at bar.

Finally, the cases cited by TLS in support of its contention that this Court has jurisdiction to hear the instant case are inapposite. (R. 10-1, Pl.'s Resp. to Def.'s Mot. to Dismiss at 5-7.) TLS does not claim that AT&T provided it with goods or services that it did not order, or that AT&T misrepresented the type of telephone service that would best serve TLS. *Contra Gowdy v. Commonwealth Edison Co.*, 345 N.E.2d 785 (Ill. App. Ct. 1976) (holding that the state court had jurisdiction over the plaintiff's claim to recover payments for services it had not ordered because the plaintiff's complaint was not a challenge to rates and, thus, did not require the ICC's expertise); *Sutherland v. Ill. Bell*, 627 N.E.2d 145 (Ill. App. Ct. 1993) (finding that the state court had jurisdiction over the plaintiff's claim against a telephone company for charging her for services she never ordered because the case was an ordinary breach of contract claim that did not require the rate-setting expertise of the ICC); *Consumers Guild of Am. v. Ill. Bell Tel. Co.*, 431 N.E.2d 1047 (Ill. App. Ct. 1981) (stating that the state court had jurisdiction over the plaintiff's negligent misrepresentation claim because the case involved "traditional claims within which our trial courts of general jurisdiction are most familiar and capable of dealing," instead of a claim of excess charges or market-entry decisions which falls within the ICC's expertise). Rather, TLS's claims against AT&T challenge the propriety of the ICC's market-entry and rate-setting decisions, and are, therefore, issues over which the ICC has primary and exclusive jurisdiction. As such, we grant AT&T's motion to dismiss because the ICC should first hear TLS's complaint.

## CONCLUSION

For the foregoing reasons, we grant AT&T's motion to dismiss TLS's amended complaint. (R. 8-1.) We instruct the Clerk of the Court to enter judgment accordingly pursuant

6

to Fed. R. Civ. P. 58.

Entered:

_____
Judge Ruben Castillo
United States District Court

Dated: March 22, 2001